Our fourth case for this morning is Howell v. Smith. When a shooter is taken into custody, in this case someone who the officer reasonably believed was either an attempted murderer or had engaged in an incident of road rape with a gun. It's a tense situation and he has to make quick decisions and take quick action to secure the individual to ensure that the officer in conducting his investigation, that his fellow officers, or that the public, are not accidentally shot. So it's your view that Officer Smith had, what, reasonable suspicion to think that Mr. Howell was the person that Mr. Wood was talking about as a shooter? Probable cause. You think it was all the way up to probable cause? Plaintiff's counsel conceded in the court below that probable cause existed to arrest him on those charges. So clear that that was the case. And clear that the charges were discharging the weapon? Correct. Correct. The department received a call from an individual saying I'd just been shot at in Griffith and I'm following the car and he was adamant at the scene of the stop that this was the individual that had shot at him. So clearly the officer's belief was, I submit, more than reasonable in believing that this individual was armed. The fact that he says, he said, I just recently had surgery and my arm can't go back like that. Does that change the calculus in this case, change the actions of the officer in handcuffing him from reasonable to unreasonable? I guess it boils down to could he have cuffed him in front given that he made that complaint? Well, Your Honor, could he have? Yes. Graham and all the other cases. And would that be reasonable or not reasonable? Reasonableness is a range. I would suggest that that probably is reasonable, but I would also submit that that unnecessarily puts an officer at risk. Now he's dealing with an individual who may be armed and instead of being at a tactical disadvantage by the officer, by his back being turned to the officer, now there's a tactical advantage that this individual has. He's facing the officer at the time the officer frisks him, at the time the officer frisks him with his gun holster. At least when he's standing behind him, he has an opportunity to protect himself. Well, there's a difference between handcuffs from an officer's safety point of view, right? Handcuffs in front, handcuffs behind. Correct. Handcuffs in the front don't do much to disable an individual. He can still attack the officer using the arms together as a bludgeon, if you will. So that doesn't really secure the situation or secure the officer or prevent the threat of injury. And what we have to keep in mind in this case, that even though the individual claimed that he had this problem with his shoulder, keep in mind the totality of the circumstances that this court has to look at. And then when we look at his affidavit, he says that he repeatedly said he was in pain several times. I understand Officer Smith denies that. Well, that affidavit, as we point out in the concluding portion of our argument, directly contradicts his deposition testimony. I wasn't so sure. I found ambiguities in his deposition testimony for sure, where, I'm not going to find it Oh, here it is, 10 and 11 in your opening brief, where I guess it's you questioning somebody. You told the officer that your shoulder was sore, yes. Did you say anything else? Just the fact that it was sore. And then at the end of that colloquy, so you never told them that you were in pain at any time. Is that correct? Answer, yes. That left me unclear what was being said, unless we were drawing a distinction between soreness and pain. Because he certainly does say, yes, I was sore, and then he maybe says, no, I wasn't in pain. I'm not sure. It's very hard for me to, and so I could see an affidavit perhaps clarifying the scope of that exchange. Well, I would make two observations, Your Honor. I pointed out during that questioning, I said, well, you said, you told, you said to the Griffiths officer that your shoulder was sore, and he conceded. That's who he said it to. Well, then he says, and the original officer that handcuffed me. And then I followed up. But what you said to the original officer was this comment about, I recently had surgery and my arm can't go back like that. Well, you never told them that you were in pain. You told them that you had surgery and your arm is not supposed to be put behind your back. Correct? Yes. That's correct. And, Your Honor, I mean, if they're going to submit an affidavit that contradicts their clear deposition testimony, there has to be some explanation as to why the affidavit is being submitted and why I am now contradicting it. No, I understand that. I guess what I'm pushing a little bit on is how clear that deposition testimony actually was. Because if an affidavit is allowed to clarify something that's already there, it's just not allowed to contradict or, you know, introduce something from left field that should have been explored in the deposition. That I concede, Your Honor. I think all I can say is look at the lengthy colloquy that I quoted in our brief with all the questioning, I think at two or three pages. All I can say is, in my mind, from this side of the bench, it's clear. I can't say anything more to you, Your Honor, than what you may be from the other side of the bench on that issue. Fair enough. I would also point out... So what about, what are we to take of, let me put the question this way. How undisputed do you think the facts are that he didn't in some way manifest further discomfort, maybe I'll try to use a different word, after he's sitting in the squad car for the 20, 25 minutes, you know, he never actually articulates a complaint. That seems to be undisputed. Correct, Your Honor. And it's his burden to establish that we acted unconstitutionally. It's his burden to say I gave some indication of it. There is nothing in the record to indicate that at any point in time during the course of handcuffing, he said anything, he winced, or he did anything in the process of the arms coming back to indicate that it was painful. I would also point out to Your Honor that, you know, he kept his wallet in his right hand back pocket at the time. So there was nothing to indicate that in the process of handcuffing, anything to corroborate his comments occurred. And now he's... Your Honor, can you give me some sense of the timeline of the encounter here? Was it a single officer who first apprehended the suspect? It was a single officer, and according to the record, he waited for backup. How long did he wait for backup? Just a few minutes. As I recall, the other officer was with the victim at a shopping center several blocks  But he handcuffed the individual and then waited for backup? No, I would prefer that to be the record, Your Honor, but no, according to his testimony, he waited for backup, I believe, to get the individual out of the car. So he stopped him and waited? Correct, stopped him and waited for a few minutes. And the other officer came and there were two officers present? That's correct, Your Honor. And that's all? That's correct, Your Honor. And I also point out that when Smith stopped him, he testified he conducted a felony stop. And what that felony stop is, is you open the door and you stand behind the door with your gun drawn and you're standing in a position of safety to the back of the individual who's seated in the car in front of him, the plaintiff. And the other officer was where at that moment? The record is not clear. All the record says is he arrived at the scene. And presumably his gun was drawn. But that doesn't mean... Do we know when the suspect addressed the second officer? How long it took in this process before he addressed the second officer? Well, the entire process took approximate... Oh, the second officer? Yeah. There was a third and a fourth officer. The second officer was Banasak from the town of Highland. They called Griffith and asked Griffith to come to the scene. A Griffith officer came to the scene and conducted the investigation. The total time there took approximately 25 minutes. The record doesn't say when Griffith arrived. My assumption is maybe perhaps 10 or 15 minutes into the detention. Griffith is the other officer the suspect addressed? It's the town of Griffith. I'm sorry. I'm sorry. That he addressed. Is that right? That's correct. He's the one... The Griffith officer took him out of the squad to question him. This is the town of Griffith officer took him out of the squad to question him and put him back in. And his testimony is, to that officer, I said my shoulder was sore. And I would point out, Your Honor, in the Stainbeck opinion that you authored and in the Rabin opinion, Your Honor, that you authored, that the parties rely upon, there is no bright line rule. And that's what plaintiff's counsel would advocate. All we have to do is consider it. And at page 10 in his deposition, Smith said, he told me that there was some problem with his arm to take it easy on it or something to that effect, and he said, and I did. And what does the record explicitly show that these officers knew about the alleged crime when they apprehended this man, when they pulled him over? Radio dispatch from the dispatcher. The dispatcher relayed the complaint from the victim who said, I'm following a guy who just shot at me in Griffith. And he describes the car, right? I mean, there's more. He describes the car, which was a large GMC-type vehicle. Gold in color. Gold in color, that's correct. He goes into some details. Correct. And again, though, probable cause was conceded, Your Honor. So I mean, there is no doubt that their belief was more than reasonable that this guy had a gun. I see I'm either beyond or into my... You can always answer a judge's questions. Thank you, Your Honor. So I will. Thank you. Mr. Vanderground. Thank you, Your Honors. May it please the Court, I represent Tom Howell, the plaintiff in the underlying litigation. Obviously, we think there's a question of fact as to whether the force used by Officer Smith was excessive. That's why we're here. Counsel's right, it's our burden, but that burden's a trial. It's a different burden here. And so what do we know? We know Mr. Howell informed the officer that he couldn't put his arm behind his back. We know that Officer Smith... Could you, as you tell us this, or maybe first discuss the affidavit, why we ought to rely, as I understand, your position is on the additional information in the affidavit. Sure. Your Honor, we take the position that you stated, actually, is that we're free to clarify. We're free to clarify an ambiguity in the testimony. There's no direct contradiction. It says, you know, did you tell officers? Yes, I told officers. He says he's sore. I think it's clear that he at least tells the officers that his arm is sore, but sore might or might not be the same thing as being painful. Right. And again, we've got a question of fact here that is probably best suited for a jury. But you know, is he sore? Does that mean that he's in pain? Does that mean that it's excruciating pain? But generally, we, you know, need some identification that he's in discomfort or he's in actual pain. And it's other than just sore. That's all we've got. Absolutely. Well, you've got sore. You've got pain. You've got the notice of the pre-existing condition. We've got sore. We've got sore. That's what we have because he doesn't say anything about pain. Because he disclaims pain in that passage before the affidavit. He disclaims pain where, this is the page 11, I mean, I'm sure it's someplace in the record. But, so you never told them that you were in pain at any time. Is that correct answer? Yes. So that's, I think, the problem with the affidavit is if he says in the affidavit, I did tell them I was in pain, and he says in the deposition, I never told them I was in pain. That's a problem. I think in his view, the testimony is he wanted to be clear with the words that he used. And so he used the word sore. That's the word, those are the words he used. And so then the question becomes, well, what does that mean? Well, it probably means different things to different people. And I don't think we want to be in a position where we say you have to use the right word to describe the situation or the pain that you're in. Because it's an adrenaline charged situation. I think any of us, the pain would be significantly worse after the adrenaline died down. Mr. Vandegrund, we have made it clear in our caseload that we have to take the totality of the circumstances under consideration. And here the district court relied on this Rooney case, which really involved a cooperative private detective stop because there was some question about the legitimacy of his TAN card. Here we've got two officers stopping a guy that they saw shooting out of a truck on the public highway. How does, I have a hard time seeing why the district judge could rely so heavily on that Rooney case. It seems to me the necessity of disabling this guy, of keeping him secure, is a lot different than with respect to that public or private eye. The case with the TAN card, I'm sorry, your honor, is the Rabin case, is the TAN card. The Rooney was a different case that counsel brought up. But the Rabin case is differentiated here, and I think this is why the district court relied on it because in the Rabin case they specifically said the other officers got qualified immunity, Officer Knepper didn't get qualified immunity because he knew about the condition, plaintiff was cooperative, no reasonable officer would believe that keeping the handcuffs was necessary to ensure safety. The other officers did not get qualified immunity because they didn't hear about the pre-existing condition. And so here, Officer Smith knew about the pre-existing condition. He knew what he was doing. But why did he have to believe it? I mean, you know, so Mr. Powell tells him, my shoulder is sore, and he, I guess Officer Smith says, I tried to take that into account, but not to the extent of feeling that handcuffing him behind his back was the appropriate measure. There's another one of these metaphysical distinctions between yanking and pulling, as I recall. But I guess pull isn't quite as abrupt or potentially painful as a yank. So I guess he knows that there's some possibility of it, but if the witness has told them that there was an actual shooting, surely a responsible police officer would want to know whether the gun is still around. Certainly. Even if it turns out, I mean, I realize it all turns out to be a giant mistake, it's too bad. And obviously it was in this case. Nobody wants that to happen, but it does happen sometimes. Your Honor, it's important to remember here that the officer's testimony, Officer Smith's testimony is that at no point did he feel threatened by Mr. Howell. And so what we're not asking for, contrary to the characterization of what we're asking for, we're not asking for a bright line rule that says, well, if a person asks to be handcuffed in front, they have to be handcuffed in front. That's not what we're asking. We're asking them that when an officer does not feel threatened, as is the testimony here, that he avoids doing something that he knows is going to hurt the individual he's dealing with. Is that what he means, though? I mean, maybe he's saying, I don't feel threatened because I've got the situation under control. You know, I'm handcuffing him, whatever. Well, he said at no point did he feel threatened, Your Honor. And to be perfectly clear, maybe that's what he needs to tell a jury, is to clarify that a little bit further. But Rooney, now that I've got my name straight, Rooney does basically say, look, if there's some ambiguity in the situation, he'd give the officer points, isn't that right? Yeah, there is. And obviously, in the totality of the circumstances, those things that we have to look at, which are laid out in the Stainback case, those things that we have to look at, the severity of the crime is definitely on the list. And so you're right, there's points to be had there. But even in the Stainback case, the Stainback case, this court created, you know, basically a potential situation where it said, it may become clear to an arresting officer that although an action would not ordinarily harm the arrestee, the action would nevertheless cause pain or injury to that particular individual. For example, an officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems. And that court, the Stainback case, cited a Sixth Circuit case where it was basically this situation. Plaintiff posed no threat, knew about the harm, the officer knew about the harm, and proceeded to act anyways. And that's where he got hurt. So what we're doing, Mr. Howell is basically saying, I'm the guy who meets that situation. Stainback also makes clear that you can have a situation where the officer knows there's some possibility the man's going to get hurt. But the exigencies of the situation still require that you secure him. Right. Absolutely. And that's why, again, we're with that severity of the crime. Is there an immediate threat? Was he resisting or evading? So severity of the crime, that's a bad one for me. Immediate threat? Absolutely not. Officer's testimony, no threat at all. And he's cooperative. And he's cooperative. In fact, Officer Smith says he was compliant, cooperative the entire time, no resisting, no evading, no anything. And so if the officer says he doesn't feel threatened, then I think we're in a position where we've got officer doesn't feel threatened, what does SOAR mean? You stack up all these things. These are a lot of questions of facts. So how much deference, then, do you think the officer has to be given to an arrestee's complaint? Does it depend on the facts? I think it's a totality of the circumstances situation, Your Honor. Because you aren't advocating, as you said, a bright line rule. Absolutely not. That would be the worst public policy idea in the world, right, is to start lowering down these bright line rules where you have to do what this arrestee says. So in terms of deference, don't you think the language or the words that are said by a prospective defendant matter? I do. But they matter. But if we're talking about the defendant, are we talking about the defendant as in my client in this case? He's a positive, putative defendant, I guess I could say. So his words definitely matter, but we also, I mean, the words of Officer Smith matter considerably, too, when he says he doesn't feel threatened. But we also don't want to be in a position... Yeah, but that's not something that helps you. Right. Well, he says he doesn't feel threatened. Right. I mean, that does help me. Right. But we don't want to... In what context did he say that? What's that? That he wasn't threatened. I asked him if at any point he felt threatened during this entire stop, and he said no. Well, of course, he may well not have, because one, he performed a felony stop, and two, he secured the man. Then let's let him explain that to the jury. You know, I mean, these are all we have in front of us right now, and I don't think we want to be in a position... But see, it matters that he didn't say that he felt anxiety or he felt threatened, and that he complied with his orders. Right. Mr. Howell did comply with everything. Right. But again, if we've got a question here as to what that means to Officer Smith, let's let Officer Smith explain it. I'm not sure that's the law though. I mean, the reason we have qualified immunity doctrine is because we don't want police officers constantly to be spending their time in trials before juries, justifying long after the fact what they did. And so, there's a boundary of uncertainty that they get to operate within, where we simply say, you know, they're doing the best they can under the circumstances, so we're not even going to bring them before, you know, a further legal proceeding for that. Then if they've done something outside that boundary, definitely, you know, there needs to be adherence to the law too. But our real question is, I think, whether Officer Smith stayed inside the boundaries that were appropriate. You're right. I see that I'm out of time. Yeah, you can answer. You know, I think you're right. That is the real question, is does this fit with the Fourth Amendment reasonableness standard? And I think we have enough ambiguity here that it's going to require a jury, and it's just not simply dismissed on qualified immunity. Okay. All right. Thank you very much. Anything further? Mr. Koenig, your time? You can have a minute if you'd like to respond. The reasonableness of an officer's actions under Griffin is an objective standard. What Smith may have felt is unimportant because it's not subjective, it's an objective standard. Moreover, Judge Ripple, you asked about the context in which this statement was made. The question was asked, did he do anything to make you feel threatened? Clearly, at the scene, when he's got a gun drawn on him, the officer doesn't feel threatened. But the potential of him having a gun is enough for there to be a risk of injury. I would also point out that under qualified immunity analysis, is it so plainly excessive what Smith did so as not to be entitled to qualified immunity? The fact that we're having this debate, Your Honor, I suggest that it was not plainly excessive. His conduct was not plainly excessive, and thus he's entitled to qualified immunity. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement. Thank you.